Good morning. Please support my name is John Stennett. I represent the appellant Stanley Hoffman individually on behalf of the estate of Phyllis Hoffman. There is one major issue in this case and that is the proper interpretation and application of 13 words in a ERISA governed plan that provided severance benefits to employees whose employment terminated for any reason other than malfeasance, retirement, or voluntary resignation. More specifically in this case Mrs. Hoffman, after 17 years of employment with ATS, had to stop her work because of a very serious illness that later took her life. The question is whether leaving her employment because of that disability constitutes a voluntary resignation. Now the trial court in this case on cross motions for summary judgment held that because there was no affirmative act on the part of ATS, the respondent, in terminating that employment that thus her main job here is to determine what voluntary resignation means. That's correct. Enter this contract that was in this plan. That's correct and the trial court kind of went off on a tangent I think when they started talking about whether there is an affirmative act on the employee or the employer that resulted as opposed to looking at the actual language of the policy that says what is a voluntary resignation. The fact that there's a resignation is qualified by the term voluntary in the case that well if it's an involuntary resignation certainly severance benefits would be applicable. And I understand that and I think just looking at the plain meaning, which is what you're asking us to do, could result in the way you want it. But what does that mean in terms of precedent and does that mean every time you know, unfortunately there's so much illness these days and if someone gets a terminal illness that the companies then have to say we've got to pay severance every time that happens? Is that going to be written? Well it depends on how they write their plan. It really depends on how they write the plan. I did cite another case, Gas Bar, where their actual plan indicated that you're entitled to severance benefits unless there's a retirement or that you leave based on disability or for cause. So there they specifically excluded leaving because of a disability. And the court actually equated leaving because of a disability as not being a voluntary resignation of employment. And here it's an employee whose employment terminates for any reason other than malfeasance, retirement, or voluntary resignation shall be entitled to severance pay. Correct. It seems very clear and actually it's our position that this language is not ambiguous. We believe, well, to be ambiguous requires at least two reasonable interpretations and we think there's only one reasonable interpretation under the facts of this case. And the facts of this case are that Mrs. Hoffman did not want to defines voluntary as making a choice. And how about if we look, and I appreciate that argument, I'm just trying to figure out here every possible angle. The discussions that she had with the HR person, I think it's Ms. Pillay? Yes. Does that in any way indicate that there was a voluntary termination based on the discussion she had during that transition period? No, I don't believe so because again it comes down to choice. She had no choice. And in fact those discussions are laid out in the deposition of Ms. Hoffman which was taken actually in her hospital room two weeks before her death in which she clearly, contrary to what the respondents say, she clearly testified that she did not resign, that ATS terminated her employment and they told her that the reason they were terminating it was because basically she was a very valuable asset to them. She was the only employee in San Diego, she was the first employee in San Diego creating the San Diego connection for ATS which her job was to raise funds for the charitable organization. She was very good at it. She raised over $60 million during her career with ATS and they wanted to keep that, her to, and she was more than willing to, there's no question about it, because she thought as she testified anything good for ATS was good for her. So she was willing to come back on a part-time basis to lead her replacement and introduce them to her contacts. And so to do that... So they did agree that she was a part-time consultant at the end? Right, and to do that ATS explained to her we have to terminate first your full-time employment which they did on February 29th, 2008 and then 10 days later on March 10th they presented her with a consulting agreement to work for no more than 6 hours a week and to train her replacement basically, which she did so. Do we, so in your view you offer alternative arguments, do we reach the contra preferendum rule argument that you make? Because it seems like that may seem to apply to insurance contracts and given that the benefits here is not an insurance contract, should it apply here? Well, I don't think the court needs to go there because I don't think it's ambiguous. Of course, the respondent doesn't claim it's ambiguous either, but we've come to different conclusions as to what it means, which may argue to the point that maybe it is ambiguous. That's up to the court to determine. And whether contra preferendum applies, we do know that it does apply to ERISA plans. And we do know it has been applied to ERISA self-funded plans. It was done so in Barnes' case of this circuit. However, then Blankenship came along and laid out the rule of when it applies and when it doesn't to ERISA plans and it basically said it applies unless there's one of three things. That the plan is given a discretionary authority to interpret the terms of the plan. That sounds reasonable. If the plan is a collective bargaining agreement so that there's no pure drafter of the plan, which is consistent with contract law. And the third one was if it's a self-funded plan. The problem with Blankenship is that they apply the contra preferendum process to that because none of those exceptions apply. Unfortunately, several other cases have reiterated that three exceptions to the application, but none of them have applied it solely to a plan because it was self-funded. It's been applied to self-funded plans that were given discretionary authority and to other self-funded plans which were the result of collective bargaining agreements, but not just because it was a self-funded plan. And there's really no rationale that's been given as to why it would not. This is just normal contract rules of construction applying to adhesion type contracts, which this is, you know, unequal bargaining position, a give it or take it position. Here's our plan. If you want to work for us, these are your benefits. And did I read your brief correctly? Are you asking for summary judgment to be entered into your favor? Yes. Well, there's two, well, yes. There seems to be a little bit of problem with that, at least, you know, so I want to talk about it because as I read the defendant's motion for summary judgment, they raised two issues. You know, one was this ineligible for severance pay because of voluntary resignation. The other is that because only full-time employees are entitled to severance pay, and according to PTSU, wasn't. And the district court, I mean, specifically said he doesn't need to reach that issue, and so I'm trying to figure out how do we get around, even if we did agree with you, sending it back for the district court to resolve that issue in the first instance. Well, on the first issue, whether it's voluntary, I think as a matter of law that we could make a finding consistent with the Steffan v. Unum case that leaving because of a disability is not a voluntary resignation or termination of employment. That seems clear. On the second step, that was not addressed by the trial court, there's no disagreement that she was a full-time employee for 13 years. She started as a part-time employee. Well, there's disagreement now that, I mean, that when she left, she wasn't a full-time employee, and so I'm just trying to figure out. Well, that's a... She was a... I'm sorry. No, go ahead. She was a full-time employee until February 29th, 2008. And I understand, and you may win ultimately on that, but I'm just trying to figure out can we, how do we not address that, I mean, in terms of sending it back to the district court. Well, I don't see where there's a dispute of fact in that regard. Okay. Okay. That's a question of law, too, as to whether or not... Yeah. Yeah, I mean, there's no... They made an accommodation so that she worked fewer hours, whether that makes her no longer a full-time employee. Right. So I think it's... I don't think there's an ambiguity, so I don't think we have to get to the contra preferentum. I think that, consistent with the Stefan versus Unum case, that this clearly was not a voluntary resignation or termination. I mean, you're talking about how the precedent for other cases... I mean, there may be other cases that this ruling would make it very obtuse on how to who was able to go to work every day, but they weren't up to par because they were fatigued, they had mental problems, they had pain, and they couldn't do their work well, and they were eventually terminated because of that. Then is that a voluntary... I mean, would severance benefits arise in that case? They would be terminated. That would have been an affirmative act by the part of the employer, which was key to the trial court in this case, and the only difference with this case is that her disability was greater. I mean, she did show up for work every day because work was in her home. That was the office. That was the presence of ATS in San Diego, but her illness was very severe, and she couldn't even pretend to be able to do a full-time work. Do you want to reserve the rest of your time? I'd like to reserve the balance of my time, yes. Okay, great. Good morning, Your Honors. Matt Kleiner on behalf of the appellee, ATS. Tell me why what your client did was fair to this woman who worked there all those years. Certainly, Your Honor. But I want to know. Certainly. So you have to look at this case in the context of the plan in its entirety, and the plan offers a whole host of benefits to its employees, including retirement, disability. This is not an ERISA plan, right? You're talking about an ERISA plan, not a plan. This is the – I'm talking about the benefits that are being offered to the employees. You're talking about an ERISA plan. I am talking about an ERISA plan that's being offered to – for the benefit of its employees. It's a group insurance plan. Well, are you or are you not? I am. You're talking about an ERISA plan. Is that what you're talking about? That's correct, Your Honor. I'm talking about the benefits that are provided under this plan to the employees, and the benefits that are being provided are, again, disability, retirement, life insurance, and severance. And when you look at this particular situation, when Ms. Hoffman went out of work because of her disability, she was paid and received disability benefits. And what she is asking for now is under the severance policy, and under the severance policy, she's asking for the same thing that she's asking for under the disability insurance, which is benefits because she is unable to perform the occupations of her job. And so in looking at what was done here, a severance – you have to look to the purpose of the plan. And a severance – the purpose of a severance benefit is to provide a dismissed employee with some unemployment benefits while they are looking for a new job. Well, you can tell that that's not the situation in this particular case. ATS did not dismiss Ms. Hoffman. She voluntarily resigned, and I understand that she was faced with a situation where she couldn't work anymore because of her disability, but that's the whole purpose of the disability insurance and the reason why that's there, and that's why she received those benefits. And unfortunately and tragically, she ultimately passed away, but there was life insurance, which kicked in at that point, and then there was also the retirement benefit. So you could have written a plan to preclude this, but I didn't see that that's the way it was written. Aren't we supposed to interpret whether or not this was voluntary? That's the issue as it's teed up to us by the district court. That's correct, Your Honor. It's whether or not this was voluntary. And why doesn't voluntary mean making a choice? It does mean making a choice. Did she have any choice about whether she could work when she was dying? At the time of her diagnosis originally, when she had the doctor's note saying that she was unable to work, my understanding, based on the record, is that she did not know or was not aware that she was dying until she was later diagnosed with cancer six months later. And again, it's an unfortunate set of events, but it was her decision to make as to whether or not she wanted to work or not work. And it goes into issues about precedent. And I think the majority of employees that have to leave their job for whatever reason are going to say that I didn't have a choice. For example, if a spouse is leaving the country and the working spouse, the employed spouse, has to leave her employment, she's going to say that it's outside of her choice. She has no choice because her husband left or if there's a sick one at home that that employee needs to take care of. In that employee's mind, it's going to be, I had no choice. And so what I'm saying here is that ultimately the subjective intentions of the employee as to whether or not they are going to continue working or not are really irrelevant. It comes down to what the district court found is that you have to look to whether or not the employer did something to sever the relationship, did something affirmative, because that's the purpose of severance benefits. In order to get the severance benefits, you have to be laid off, for example. That's the most common situation where you're going to have the severance benefit, right? And in this situation, it's a classic disability claim, and she was paid her disability benefits. And so for that purpose and that reason, we're trying to fit a disability claim into a severance claim. But if we, I mean, if we just go on the language which we're supposed to and which you had the ability to control, and we look at what voluntary resignation is, I mean, you make some good policy points, but that probably could have been incorporated into the plan language with respect to severance, especially if it supports the purpose of severance, as you say, but that's not what we have in front of us. And so we're limited to the, you know, plain meaning of voluntary resignation, at least it looks like from my view. And so district court's definition that he, what he relied on, I think the arguments have been made, and I think they're probably well-based arguments that, you know, voluntary resignation means voluntary, I'm trying to figure out what your best argument is against that. But if we just are looking at voluntary resignation and the language, and if you look up the definition, how does that help you? I think that you have to interpret voluntary resignation in the context of the full plan, as I had discussed, and how it interrelates to the other plan provisions. Because if you interpret voluntary interpretation to say in this situation that she didn't have a choice because she was disabled, then you're going to effectively render a severance policy into a disability policy that will apply in basically every situation where you have a person who's disabled and can no longer work. Well, unless the plan language says differently. Because I mean, here voluntary resignation's not defined in the plan. But you can determine based on the plain language of this policy that the intention is when you have someone who either retires or resigns that you're not going to give them severance benefits. But disability benefits are totally different from severance benefits. This doesn't become a disability plan in that sense, it just means that whatever narrow benefits that you get on occasion of severance apply. So, I guess I don't, your first argument was that she, that people who go with their husbands or their wives and move and leave for that purpose don't make a choice. And I don't think that's true. In my point, I'm sorry. Yeah, go ahead. So could you explain that point a little bit? My point is that in that employee's mind, when you're looking at the subjective reason why they are leaving employment, if the employee's husband or spouse has to leave the country and the choice is to... It's a choice. It's a very difficult choice as to whether or not to keep your job or to go with the spouse. And lots of people choose to stay. And in this situation as well, it's a very difficult choice in terms of continuing work or not continuing work. She was able to continue in a part-time role and it was... It looks like she was desperately trying to continue to work. And so, I mean, it just seems like it cuts against it being voluntary. And I guess just trying to figure out maybe perhaps why we're even here, I don't know if you all considered mediation, but this is an employee who worked for you for 15 years, made millions of dollars for your organization. And we're talking about $63,000. I don't know what the attorney's fees are, but I imagine they're considerable for you being here today. And it's just kind of remarkable that this wasn't resolved before today or couldn't be mediation possible. I didn't handle the underlying case in terms of mediation. Well, but you're here. But you're here. But you're here today. I know there were discussions and attempts to try to settle, but... It's just a remarkable situation to be in and I don't envy you, but make the best arguments that you can. But I'm just trying to figure out why would we, why would you even be here today with this kind of record before us and the law? Mediation, you know, it's always possible, always viable. Yes, Your Honor. Let me ask you a question. Anyone sit down with her and explain to her that if you're going the route that you're now taking, that you will not get severance pay, whatever this thing is. Yeah. Severance. Anybody sit down and talk to her about it? Say, these are what you get, this is what you don't get. Not to my knowledge on the severance pay because I don't think that was an issue that anyone was thinking was occurring. What'd you say? Not to my knowledge as to the severance pay because I don't believe that was an issue that anyone had contemplated occurring because... Well, but you should sit down. It's just smart to do that with your employee. Ms. Pillay never said, you know, if we go this route, you won't get severance pay. That never occurred, apparently, in the record. There's no evidence of that occurring in the record. What did occur is that they did work with Ms. Hoffman to figure out a way that she continued to get her disability benefits by making sure that the amount that she worked didn't interfere with that. So a lot of efforts went into making sure that she did get all the benefits to which she would be entitled. But again, the severance is something that just doesn't apply here. And I think that the district court's decision shows that at a minimum, there's at least one reasonable interpretation from our side of things. Yeah, but if it's ambiguous, it goes against your side. That's correct, Your Honor. There's plenty of ambiguity. And if it's ambiguous, then the proper course of action would be for this court to remand it back to the district court to decide on a question of fact to determine which interpretation is more appropriate. And this is a contract of adhesion, right? This is a contract that the employer prepared, yes. Adhesion. Yes, Your Honor. Yeah. So, you know, it's all moving in her direction. But again, at the same time, it should go, if there is an ambiguity, and because we have one interpretation here the district court found was . . . But how about contra preferential? Does that apply here? No, Your Honor. It doesn't apply. If there is an ambiguity, then because this is a self-insured plan, contra preferential would not apply. Even though there's a case that I think recited to the contrary, I think? There's the Blankenship case. Right, the Blankenship case. That's right. It says that it does not apply to self-insured plans and that there's other cases that have reiterated that language. So the idea of contra preferential applies where you have . . . Well, but then in reading the Hoffman's reply brief, it seems like they distinguish Winters, Ely, and Kuman from this case. So I'm just trying to figure out, you know, is it wrong to apply the contra preferential rule to self-funded ERISA plans that are not the product of an arm's length negotiation and where the administrator is not granted discretionary authority? Your Honor, when you get to the doctrine of contra preferential, the purpose is when you're insurance contracts and insurance companies have teams of people that are drafting these policies, and they know what they're doing when they're drafting these policies. So there's this public policy to give the benefit of the doubt to the insured. In this context, we have a self-insured plan. It's an employer who's not in the business of drafting insurance policies and contracts. They're just in the business of wanting to make sure that their employees . . . They hire a lawyer to do it, don't they? I would hope. I don't know, Your Honor, the answer to that question. But at the end of the day, it's the employer who's drafting this, not an insurance company, and they're not skilled in doing this. Well, that's no . . . The insurance company is not skilled? Is that what you said? No. No, the employer. This is not the role that the employer . . . It's not their business, unlike an insurance company, in which case you . . . which is the purpose of applying the contra preferential. Unless there are any further questions, Your Honors, I will at least admit. Thank you. Thank you very much. On the argument that the disability plan somehow trumps the severance plan, and the argument that you need to take a look at the entire plan together. At the trial court level, we made the argument and pointed it out, and in the trial court's opinion, he discusses that in the last paragraph of his ruling, that the disability plan actually provided for offsets for severance benefits. Therefore, there was an anticipation that one could go out on disability and also receive severance benefits. So there's a consistency there, at least from that standpoint, that it's not inconsistent to receive both. Furthermore, with regard to the purpose of severance benefits, there was no evidence as to the purpose of severance benefits at the trial court level. But another purpose might be to reward a loyal employee for staying with him for a long time, which is exactly what Mrs. Hoffman was, a very loyal employee whose life almost was ATS. And lastly, on the contra preferentum application, I do cite several cases on page 5 of my reply brief in which it has been applied to self-funded plans. The Barnes case is the first one. There's a subsequent case from the circuit by Scano versus Microsoft where they applied it. But that was vacated en banc by this circuit. But what the en banc opinion was was that instead of having the circuit court interpret the provisions, which were never interpreted by the plan itself, it was remanded back to the plan for their first attempt to interpret the policy. But there's a concurring and dissenting opinion by five justices who disagreed with that but indicated if they had occasion to interpret the plan, they would have done it the same way as the initial court did. In other words, apply the contra preferentum to the policy, even though it was self-funded. Okay. You can save that one minute and 42 seconds the next time you come here. I'm sorry. Thank you. I think he said you can save your time for the next time you're here. Thank you very much, both of you, for your arguments. The case of Hoffman versus American Society for Tech Yon Israel Institute of Technology is now submitted.
judges: Schroeder, Pregerson, Murguia